The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We are now ready to hear our first case, Clodfelter v. Republic of Sudan. Mr. Hill Hall. Good morning. Andrew Hall for the appellants. This is the third time this matter has been before the Court. We are here challenging the trial court's dismissal on grounds on the premise that the trial court was of the view that this case could not be brought again because of res judicata and because of the effect on Article III and the final judgment. We think, and we suggest to the Court, that the entire issue really becomes resolved in analysis of res judicata, res judicata principle, which this Court will use de novo. There is and there was a cause of action created under 1605 Ed. in 2008. That's uncontroverted. That cause of action did not exist prior in time. The law prior to the cause of action being created for terrorism was essentially that the statute, the Far South Immunities Act, created a jurisdictional provision and the law surrounding that claim had to be found elsewhere. In this case, the law applicable to the underlying claim was under the Death on the High Seas Act, which was passed in 1920 and provided a very narrow, limited form of relief in a wrongful death on the high seas. Because that was the limitation of the claim and because the claim arose only on the Death on the High Seas Act, a number of the appellants in this case received no reward at all. And the other ones that did received reward limited through the personal representative to support. You can see, there's no question, is there, you did not file a related claim, a related action under 1083 C3? We could not. It was our view we could not. Well, it was because you missed the statute of limitations? No. The statute of limitations is a 10-year statute in our view. No, but there's a time period within which to file a related action under 1083 C3. Right, and we filed a motion to request relinquishment in this court so that we could do that. It was remanded for the purpose of determining whether we could do it. Judge DuMore determined that we did not qualify under, but we did not file an independent action. You did not file a related action? Right. We did not. It was our view that because we were within the time of the, because that's tied to a judgment. Because we were on appeal, the judgment essentially was not in effect at that time in our view. It was not a final judgment. It was being reviewed by this court. The matter came back up. The court did not ever totally relinquish jurisdiction and sent it down. It was a limited remand. Ultimately, by the time the matter was sent down the second time, it was sent down the second time on the premise that the matter was moot because we had filed a related action. You filed a wrongful death action under the Death on the High Seas Act? I'm sorry. I missed the question. You did not file a wrongful death action under the Death on the High Seas Act? The original case was brought under that statute, correct. Haven't you also filed a wrongful death action under 1605A? Now we have, yes. And really the only difference is the remedies that are available to you under 1605A? No. The difference is the cause of action. In other words, the cause of action under 1605A, the elements are that an act of terrorism caused the death. Under the Death on the High Seas Act, it would be a different claim. That is to say, there was a death on the high seas, which brings into the limited remedy. The elements are different. But if you're speaking in terms of plaintiff's preclusion as compared to race, gene, and economy, there were no adjudication of facts under a plaintiff's preclusion doctrine in the first case that would preclude the bringing of the second. The whole premise was that we're splitting the cause of action and the law on that, and I invite your Honor's attention to Waller v. National Supreme and the United States Supreme Court, is a 1605A claim didn't exist. And therefore, that cause of action and all the elements of the cause of action and the damages of the cause of action couldn't have been asserted incident to the death on the high seas. But most importantly, the aspect of the claims of a number of these people for their independent claims of pain, suffering, loss of the support of their brothers, sisters, those claims didn't exist. So these are brand new claims that came into the law. If you had filed within 60 days of the, I think it was a December 2009 order from the district court, if you'd filed a related action within 60 days of that date, would that have eliminated the issues that you have now? No, I don't think so. Because there's a first question as to whether or not we could have done that in light of the fact that we still have appellate jurisdiction in this court. This court had religious jurisdiction. There still would have been, as the trial court found, the constitutionality of the statute, the Article III question, a number of the other questions. With respect to the race judicata issue that we're facing now, would not a related action have cured the difficulty, the primary difficulty on which the district court relied in finding the race judicata bar? I don't think so. But how can that be if 1083, if the related action provision provides an explicit waiver of race judicata and collateral estoppel offenses? I understand. It is our view that race judicata doesn't come into existence because the 1605A claim doesn't arise until 2008. That's after our judgment. So consequently, what we have is a situation. Let me just try it somewhat differently. There was a whole body of cases prior to Mississippi in which the court found that there had been essentially the existence of an act of terrorism, if so, in fact, it was the cause of action itself. After Mississippi, that changed. And in creating this thing, I believe that Congress intended that the people who filed that claim and had a judgment that would have been affirmed needed to be relieved from the collateral estoppel effects of the fact-finding that would potentially occur that didn't have a claim. Our claim was jurisdictional. That's why we couldn't make the claim because we were within the transitional. You said you couldn't make a claim. Which claim were you talking about? The 1605A claim didn't exist. But you had a claim, an existing claim, that could have been converted to a 1605A claim within the 60 days available to you under 1083C3, which would specifically have waived race judicata and collateral estoppel. Well, that assumes that it existed. Well, let's assume that then and go to my question. Right. Would it have eliminated it? Not according to Judge DuMars' orders. Well, I'm not referring back to Judge DuMars' order. I'm referring to the plain language of 1083C2B. Does it not provide an explicit waiver of race judicata and collateral estoppel defenses? That's right. It does, clearly. But that assumes that they existed. In other words, what I'm trying to say to you is I don't believe that those claims exist. In other words, the law, the way I'm reading the cases that we cited to you, is the race judicata doctrine wouldn't apply because our cause of action was a new cause of action that did not exist prior to 2008 and couldn't have been asserted at all. Well, then what is the point of 1083C3? What does it do? I think that was addressed to those body of cases in which prior to Sicipio, the people asserted, the victims asserted that the act of terrorism was the cause of action, and it allowed them to read it. If they lost on that, it allowed them to not be barred by that, essentially come back in by doing the related claim. Essentially, the way I read the statute is there is a body of cases that arose prior to the 10 years. In other words, in 2008, you roll back 10 years to 1998. If the act of terrorism occurred prior to 1998, you needed that window in order to survive because otherwise the statute of limitations would have run. And it therefore also weighs— The 60-day window you're referring to. Yes, that's right. It also weighs race judicata. It also weighs collateral estoppel. It is in that context that that statutory framework exists. I would submit to you that I believe that what we're talking about now is in this context, the race judicata principles, the way we understand it, never came into play until 2008. Could not have. And because it could not have come into existence, that framework of transition really wasn't designed to apply to the type of case that we had. So, thank you, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Adam Jett for the United States. As the Court is aware, the United States is participating in this appeal only on two narrow questions. At the Court's invitation, we're here to discuss the plow problem. If the Court is interested, the district court could refer to. And just because we think it implicates a specific interest of the United States, we have also argued that the district court had authority to respond to raise the question of race judicata. Well, could we start with the second question, Mr. Jett? I have real difficulty with the notion. I have respect for sovereignty, both our governments and other governments. But here we have a sovereign who actually participated in the case. Actually participated in the case through capable counsel and made a decision, presumably, a well-informed, conscious, willful decision. You know what? I don't care about this case. I don't care about this case. I'm out of here. Never to be seen again. And yet we have this district judge stepping into counsel's shoes, to put it somewhat loosely, raising affirmative defenses on behalf of a sovereign nation that was in the case and made a conscious decision to get out of here. You know what? That doesn't look like American litigation to me. I dare say that if our Justice Department went into a court in London or Paris or Delhi or Santiago and participated in a case for a while and then said, you know what? The United States is out of here. I don't think any of those judges would step into counsel's shoes and start raising affirmative defenses that the United States Department of Justice chose not to raise. So sorry for the long-winded introduction, but what's going on here? Sudan doesn't care about this case, doesn't care about affirmative defenses. Where does a United States district judge find the authority to do what that sovereign nation is elected not to do? Well, Your Honor, if I could just sort of maybe briefly touch on the factual premises of your question, and then I have kind of a couple of legal responses to them. On the factual premises, I don't know the exact facts of sort of the moment that Sudan left the case, but what I can tell you, Your Honor, is that, and this is true of a foreign sovereign or indeed of any defendant, a party, and this is well established in American law, of course, can appear just to contest jurisdiction and for no other purpose. And I believe that is what Sudan did in this case. I don't know the exact timing of its participation, but I believe it argued that there wasn't jurisdiction over it. When it lost, it appealed that, and it didn't participate on the merits at all. Exactly. So it had its one shot. Well, I mean, just to clarify. No, I understand. I mean, it is obviously a little bit of a— Did Sudan file a petition for cert? No, Your Honor. Exactly. So they had one shot of appellate review on the question of jurisdiction. They lost, and they said, okay, we're out of here. I'm out of here. Well, so that was, of course, as Your Honor is aware, was the first case. The case that we're talking about here now is the second case, and I know that, of course, you were just discussing with my friend the question of whether the case should be treated the same, and that's something that the government is not participating on. But just to point out, those are two different cases. To my knowledge, Sudan didn't appear in any capacity in the second case. Because it had already lost their jurisdiction. That's all they wanted to litigate. Obviously, I can't speak to what Sudan's motivations were. In the first case, Your Honor is, of course, right that it is a little bit of a legal fiction, but it is a legal fiction that is sort of well-established in the legal system that you can appear for the purposes of contesting jurisdiction, and it's sort of treated as if you didn't otherwise appear. But let me actually just offer real legal answers to your question, sort of setting aside the facts. It's well-established, and I think this is sort of common ground amongst all of the parties in this case, that the question of res judicata is a little bit different than a normal affirmative defense. I mean, the Supreme Court said this in Arizona versus California in the Montana case that we cite in our brief. Res judicata serves not just as a defense for the defendants, but also to protect the integrity of the justice system. Courts are, this is well-established, allowed to raise it sua sponte. Courts don't have to accept a waiver of the defense. So it's quite different from a kind of standard affirmative defense. Absolutely. Go ahead, Judge. There are certainly cases where the principle is recognized, but there aren't that many cases where it's actually applied, and the district court leaps, to use Judge Davis's analysis or analogy, kind of into counsel's chair to do that. So I'm looking for some specific reasons as to why it was appropriate in this case. Sure. So courts have not clearly laid out the exact circumstances in which it is either appropriate or inappropriate sua sponte to raise this defense. But if you look at the sort of various cases that have touched on this, essentially the theme is, it's almost kind of like a court doing equity. Essentially, if the defense is obvious, if there's been a lot of prior resource use, if there are other, the language that the Supreme Court used is special circumstances, then a court is able to raise it on their own. And we think that in this case, there were three different reasons, all of which point in the same direction that the district court had authority to raise it. Obviously, whether it was applicable is a different question, Judge Davis. I understand that. But whether it just had authority to raise the question, to ask the parties to brief it. I'm sorry, Your Honor. And these are, I think you're getting to what was my question, and that is the special circumstances under Arizona. That's correct, Your Honor. And we think there are three different circumstances applicable in this case. Two of them, Judge Davis, are related to the fact that there's an absent foreign sovereign, and one of them is entirely unrelated to there being an absent foreign sovereign. So the two circumstances related to there being an absent foreign sovereign, one is just that this court said in a slightly different context related to the statute of limitations defense in the airline case that we cite, that a certain degree of comedy needs to be shown towards a sovereign. And so just the mere fact that it's a sovereign and comedy needs to be shown towards them is sort of one, we think, special circumstance. A special circumstance is that by statute, Congress has charged the district court when dealing with an absent foreign sovereign, even Judge Davis, an absent foreign sovereign that initially appeared to condest jurisdiction and then left, to exercise a certain screening function. Now, we're by no means saying that 16 OAE requires that the district court work through potential affirmative defense. Well, that statute, in fact, is very specific. It uses the term acclaimed or right to relief by evidence satisfactory to the court. And it seems like to me that if Congress wanted to be more expansive than that and include affirmative defenses and other items that the court might recognize, that they would have worded this statute differently. They were very specific, and they talked about evidence. And evidence isn't something that's really the object of this argument on res judicata. Well, Judge Agee, we're certainly not saying that district courts are required under 16 OAE to work through these various affirmative defenses, but we think that at least when dealing with something like res judicata, which again, separate from other affirmative defenses, it's established that a court can raise on its own if there's a special circumstance, that the 16 OAE screening function, and again, you look at a case like Erroline, which talked about a court having a special screening function, gives the court's ability to do that. But isn't the screening function there really focused on the merits of the claim, evidence sufficient to prove the claim, not evidence going to limitations and res judicata and the discovery rule? I mean, where do you draw the line? Well, again, Your Honor, conceitedly, the text of 16 OAE refers to evidence, and so we're not saying that Congress in 16 OAE required a court to look at various affirmative defenses in the way that it obviously did require a court to look at evidence. So Judge Agee is saying, so courts not required to, court is permitted to, where do we draw the line? When can we recognize an abuse of discretion? When will we know what we see is an abuse of discretion? Well, I think that under 16 OAE, at least when it comes to res judicata, obviously there might be separate arguments with regard to other affirmative defenses, but at least when it comes to res judicata, if the district court is operating under 16 OAE, it can raise the question. Obviously, if, in fact, it made a mistake in ultimately deciding that the case is res judicata, that's a separate issue, and I understand it's one that's being discussed in this case. But in, for example, Your Honor's scenario. Your argument, just so that I'm clear, your argument is that there could never be an abuse of discretion in raising it. There could only be legal error, which we would view de novo, in interpreting or applying res judicata. Is that your argument? In a case where they were entering a default judgment against an absent foreign sovereign, that's correct, Your Honor. So, Your Honor, if you could imagine a scenario, for example, where the same plaintiff kept filing the same suit against an absent foreign sovereign, and they were there the ninth time around, and they had the same identical evidence that had already succeeded in eight prior cases, and the absent foreign sovereign wasn't there to say, well, wait a minute, this is obviously barred by claim preclusion. We think that if the district judge said, enough is enough, you don't get a ninth judgment this time, that the district judge wouldn't be abusing his discretion by at least just raising the question, by at least asking the plaintiff, wait a minute, haven't I seen you eight times before? Could you tell me why it is that this case is not barred by claim preclusion? You said there were three reasons that this scenario may represent those special circumstances. That's correct. And we've done two. That's correct, Your Honor. The two related to there being an absent foreign sovereign. The third just deals with prior resource use. So the Supreme Court in Arizona v. California sort of pointed out that there hadn't been extensive prior litigation on the question and issue there. Here, by contrast, obviously there has been a prior case that went to judgment. Indeed, that case came up to this court three different times. Now, again, whether that case actually bars this case is, of course, the quote-unquote merits question of whether claim preclusion is applicable. But when a district judge is faced with prior litigation, which actually that same district judge had spent a lot of time on, and which this court had spent a lot of time on, we think that then it's in the district judge's discretion just to raise the question, to ask the parties, look, is claim preclusion applicable? That's entirely separate from the existence of an absent foreign sovereign. For the purposes of this case, because there are those special factors related to an absent foreign sovereign, we don't think it's necessary to sort of flesh out exactly the degree to which resource use kind of authorizes a judge to raise these questions. But in fact, because that's obviously the absent foreign sovereign scenario, it's a very uncommon one, the resource use scenario is one that Your Honors will find more if you look at just the various case law touching on these questions. I'm assuming from your argument that in looking at the race judicata issue, you bifurcate the standard of review. Raising it sui sponte is subject to an abuse of discretion standard, whereas the merits, an analysis of the merits, the application of the doctrine is subject to de novo review. I believe that's correct, Your Honor. The only reason that I'm sort of hesitating there is that generally when courts address those questions, they obviously address them together. Often sometimes quite opaquely kind of mixed together, and as a result when courts discuss what the standard of review is, it's sometimes actually a little bit difficult to sort of tell how those are being teased apart. That could be an important factor in this case, because it would seem like to me that if we were to determine the issue of race judicata should not have been raised at all by the district court, that goes a long way to requiring a reversal. I mean, to some extent, Your Honor, I suppose that would turn on the basis for this court reaching that decision. Of course, as Your Honor is aware, if there's an error of law, it is by definition abuse of discretion. And so if the sort of various reasons that this could be, using the Supreme Court's language, a special circumstance, the court thinks it is not a special circumstance, then in some sense that's actually just a legal error, and then the standard of review wouldn't exactly matter. So it's not the – what an odd way to say it. It's not the presence of an absent sovereign that's a special circumstance. It's the fact of an absent sovereign and the underlying issues of comedy. Is that your argument? Or which is it? Your Honor, I apologize. No, no, you don't have to apologize. I may be being unclear, and I may be misunderstanding your question as well. When there is an absent foreign sovereign, that presents a special circumstance for two different reasons. One of them is because it's an absent sovereign, setting aside 16088, just because it's an absent sovereign, looking at, for example, this Courts Error Line case and discussing statutes of limitations, the comedy that should be shown towards a sovereign creates one potential special circumstance. And you don't – I'm sorry to interrupt. Sure. You'll get to your second. But the fact that it's an absent sovereign who has appeared, admittedly in the earlier case, appeared, appealed, and then abandoned the litigation, that doesn't affect your analysis at all. Not in our view, Your Honor. I mean, for example, in the Error Line case, the sort of – Well, if it's an equitable – I don't see how that cannot be a factor to be weighed heavily if we're taking this on in some sense of a court of equity and an abuse of discretion. Well, Your Honor, maybe let me sort of approach it from a slightly different angle. A sovereign exactly the same strikes me as odd. A sovereign who says, I don't think they have jurisdiction, we're not going to appear, as opposed to a sovereign who says, I don't think they have jurisdiction, I'm going to specially appear, as you said, using the legal fiction, and actually litigate that question, and if I lose, then I'm going to abandon it. Those two sovereigns don't seem to me to be similarly situated. And the consequences ought to flow from that difference. Let me just tease that apart from a slightly different angle. Of course, Your Honor, 1608E, the independent screening function, which has been given when an absent sovereign exists, was fully applicable in the second case. Indeed, it was also fully applicable in the first case, even though Sudiana briefly participated on the jurisdictional question. So to the extent that the screening function given to the court under 1608E, like the screening function discussed in this court's Error Line case, is a special circumstance for raising that sua sponte, that would essentially be the end of the inquiry. The use of the evidence, as Judge Agee suggested, is as expansive as you would interpret it. Well, and again, Your Honor, I... The use of the word evidence goes to substantive liability for the underlying claims. Sure, and again, Your Honor, I just want to make sure that I'm making this argument clear. I feel like maybe I'm not... I'll stop interrupting you for a moment. That would help, because I'm losing track of which question he's... Sure, so let me focus, for example, on the question of 1608E. It seems like there are two different arguments that could be made about why 1608E is relevant. We're only making one of those arguments, and I feel like maybe they're actually getting mixed together. So let me just kind of clarify that. One could argue, but this is not what the United States is arguing, that when 1608E requires a district judge to assure itself of the validity of a claim before it can enter a default judgment by looking at the evidence in other such matters, one in theory could argue, but the United States is not arguing, that for the district judge to do so, in addition to looking at the evidence, the district judge also needs to consider any possible affirmative defense, whether it be race judicata or statute of limitations or anything else that could possibly arise. The United States is not making that argument, and Judge Davis, I think that is actually the argument that maybe your earlier questions were getting to. Rather, the United States is making a different argument, and that different argument is, as the Supreme Court said in the Arizona case, the specific question of race judicata, so not all affirmative defenses, but race judicata specifically, can be raised by a district court to respond to in special circumstances. One special circumstance that we think is applicable to this case is the fact that the district court has some kind of a screening function. We're not saying that the district court would always be required to consider questions of race judicata, and we're certainly not saying that the district court would always be required to discuss any other potential affirmative defense. Rather, we're just saying that because the district court serves a special function in screening these claims, which exist by virtue of the statute, that that presents one of these special circumstances. And although the case is certainly not exactly on point, we think that an analogy can be drawn to this court's discussion in the airline case, where this court made clear that a statute of limitations defense, which in fact is a more classic affirmative defense, it's not something like race judicata that actually serves a protective function for the court. Rather, it's actually a normal affirmative defense. Nonetheless, in airline, this court made clear that when the court serves a screening function in certain habeas cases, in certain IFP screening, that at that point, the court then can actually raise that defense. And we think that if that's true with regard to the screening function for a real affirmative defense that courts normally can't raise on their own, that it would certainly then present a special circumstance for something like race judicata, where it's well established that courts can raise it on their own. I apologize if that wasn't clear in our brief, but I'm hoping maybe I've teased out the distinction a little bit. So there's... Then I'm not clear that there's any particular distinction between your first special circumstance and your second special circumstance, which you acknowledge as both being related to the existence of an absent foreign sovereign. They are, Your Honor. And maybe more accurately, we should have counted it as one. The only reason that I just sort of did them as two is because in theory, if you had a sovereign who wasn't protected by something like 1608, like, for example, the states at issue in the airline case, then you have the comedy factor. Here we also have 1608E. And then we have the third reason, which is just separate and aside from the existence of the foreign sovereign, which is just the extensive resource use in the past. And again, Your Honor, just to be clear, it's not necessary for the court to hold that any one of those is itself dispositive. We have kind of three different equitable reasons all pointing in the same direction. At least with regard to this case, this means that the district judge had the authority, again, just to raise the question, not necessarily to reach the conclusion that he raised, that he did, but just to ask the parties to address the question. Some of the D.C. Circuit district opinions, for lack of a better way of expressing it, seem to find limited value in comedy where the absent defendant is a nation that's a state sponsor of terrorism. Is that one of the equitable factors that we would look at? Your Honor, I apologize. I'm not sure that I know which cases you're referring to. In the, for example, various Iran cases that were discussed in some of the briefing and in the district court decision, I think most of the analysis there was actually just on a substantive question of whether the case was res judicata. It was not the judge kind of justifying his own raising the question of res judicata sui sponte. But to just sort of address the principle that I think may be behind your question of just kind of whether comedy to a sovereign would apply to a sovereign that has been accused of acts of terrorism. Are all sovereigns treated the same? I think the answer is probably yes. For the purposes of this case, it's certainly not necessary to decide if a state is treated the same as a foreign country, is treated the same as a foreign country who's been accused of a particular act. And I should point out, by the way, Your Honor, and this is an important distinction, obviously the plaintiffs had sued the defendants for state sponsorship of terrorism. But at the point that the district court raised this question sui sponte, there was not yet a judgment in the case against them. I mean, in other words, the process is plaintiff comes in and accused defendant of state sponsorship of terrorism. The court says, well, wait a minute, maybe I shouldn't even be hearing this case at all. And we certainly think it would be improper for the court to fast forward to a possible merits conclusion and then sort of work backwards and decide that you shouldn't have raised the question at all. But again, it's just raising the question. And for that purpose, it is just equitable deference to the existence of a sovereignty sufficient, as is the screening function and as is the resource use. Unless the court has any other questions. Thank you very much. Thank you, Your Honor. Mr. Hall. Judge Agee, you made a comment and I want to invite the court's attention to Judge Royce Lambert's decision in In Re's Law Republic of Arraigning Terrorism Litigation, which is cited in our brief on page 23. In that quoted section, I believe that Judge Lambert expressly spoke to the point that you, Judge Agee, just raised. When the court said that, and I'm going to quote, private citizens involved in civil litigation may certainly achieve settled expectations that are reinforced and well served by application of preclusion doctrines, but the same cannot be said of foreign states acting within the vast international arena. It goes on to say that, thus, while individual lawsuits by United States citizens and nationals against state sponsors of terrorism may have some bearing on how rogue nations like Iran might perceive and manage their relations with the United States, it strains credibility to assert that Iran has any reliance, interest, or settled expectations with respect to prior civil actions litigated against it under 1605-87. Indeed, the notion is almost laughable because that nation has never appeared in any of the terrorism actions that have been litigated against it in this court. We think that that is basically saying to this court that if we're going to basically talk about special circumstances that would bring into play a sui sponte consideration of race and geography, there is no automatic nexus between a foreign sovereign and that special circumstance, particularly when we deal with a rogue state that is engaged in acts of terrorism, first of all. And secondly, as Judge Davis pointed out, Sudan was an active participant. Let me just bring to mind how active it was. There was an initial default entered in the first case against Sudan. Sudan then entered that case and filed a motion to vacate the default. Judge Dumas expressly said, I'm going to let you do that, but don't think you're just going to litigate the jurisdictional question and then we're done with it. You are going to stay here throughout the entire litigation. Is that clear? They said, yes, that's clear, that's fine, they did it, they entered. So they then appeared, attacked jurisdiction, went up on appeal, they were here during the oral argument, as you may recall. After that was reversed, they didn't leave the case, they just refused to participate. Their lawyers sat through the entire case. And in point of fact, they were part of what came before you when we got into this issue of, because the real issue, as far as we were concerned, is there's a mandate rule, meaning when the case is on appeal, it's within your jurisdiction. I don't have a judgment I can simply walk away from without violating your jurisdiction and file a related action without your consent. That's why we filed the motion. At trial that generated the initial judgment, which I guess would have been the 2009 judgment, counsel for Sudan was physically present. Physically present and refused to ask a question. And was asked if they wanted to ask questions throughout the hearing. So I just wanted to point that out to you. Because if we are talking about strategic decisions having an effect on special circumstances, clearly that would apply. Thank you. Thank you very much. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, G. Steven Agee, Andre M. Davis